**M & W MASONRY CONSTRUCTION, INC., an Oklahoma Corporation, Appellant,**

v.

**John HEAD et al., Appellees.**

No. 48321.

Court of Appeals of Oklahoma, Division 2.

June 1, 1976.

Rehearing Denied July 13, 1976.

Certiorari Denied March 25, 1977.

Released for Publication by Order of Court of Appeals March 31, 1977.

Ronald D. Fulkerson, Oklahoma City, for appellant.

Charles L. McBride, Stillwater, for appellee John Head d/b/a Head Construction Co.

BRIGHTMIRE, Judge.

A masonry subcontractor brought this action to recover $10,810 it claims is due for 94,000 bricks laid in veneering an apartment building in Stillwater, Oklahoma. The trial court, in the jury-waived case, sustained a demurrer to its evidence and then rendered an $11,668.67 net "excess cost" (supracontract cost) judgment on defendants' counterclaim for completion of the brickwork against plaintiff. The latter assails the adjudication on two grounds—(1) plaintiff's proof supported a cause of action while defendants' did not and (2) the award to defendants was excessive.

I

On November 20, 1972 plaintiff, M & W Masonry Construction, Inc. (M & W) of Purcell, Oklahoma, entered into a "Standard Sub-Contract Agreement" with Head Construction Company (Head) to furnish all labor, tools, and equipment for completion of all masonry work on an apartment complex (Southern Heights Apartments) being built by Head for the owner, Southern Heights, Inc. Head was to furnish all brick, block, sand, cement and wall ties. M & W was to use diligence in completing the work and to receive $115 per thousand for bricks laid and $.50 per block for firewall blocks laid payable as follows:

"...    .    . in installments as the work progresses, on estimates to be made of the proportionate amount of materials delivered and work or labor performed by Sub-contractor. Reference is hereby made to the general contract between Contractor and Owner, and the payments be paid to Sub-contractor shall be payable as and when Contractor receives payment from the Owner for the work performed and materials furnished hereunder. Sub-contractor shall receive his proportionate part promptly as payments are made on estimates to Contractor. In the event that said contract between Contractor and Owner shall not provide for retained percentages, the payments made to the Sub-contractor hereunder shall be 90 per cent    .    .    . of the estimates    .    .."

The general contract referred to contemplated monthly progress payments. Article 3B. reads:

"Each month after the commencement of work hereunder, the Contractor shall make a monthly request for payment (in quadruplicate on FHA Form No. 2448) by

the Owner for work done during the preceding month. Each request for payment shall be filed at least five (5) days before the date payment is desired. Subject to the approval of the Lender and the Commissioner, the Contractor shall be entitled to payment thereon in an amount equal to (1) the total value of classes of the work acceptably completed; plus (2) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (3) 10 percent holdback and less prior payments. The 'values' of both (1) and (2) shall be computed in accordance with the amounts assigned to classes of the work in the 'Contractor's and/or Mortgagor's Cost Breakdown,' attached hereto as Exhibit 'A'. The Contractor agrees that no materials or equipment required by the Specifications will be purchased under a conditional sale contract or with the use of any security agreement or other vendor's title or lien retention instrument."

In its case in chief M & W established it began work under the subcontract by completing some firewalls someone else had started. The brickwork, which was estimated to total around 250,000 bricks, was not begun until February of 1973. Once the bricklaying started, plaintiff requested monthly progress payments but none were received.[1] One excuse given for failure to pay came after plaintiff had laid about 50,000 bricks. It was that the brickwork was faulty—some were crooked and some had head joints that were not full. Nevertheless, defendants told plaintiff if it would go on working and finish Building "D" on a trial basis, that the other work would be approved. Plaintiff went back and corrected the items contained on the "punch list"—construction parlence for a list of items needing repair or correction. This was in March or April. One of the complaints was about the color of the brick—a complaint which should have been addressed to defendants, who furnished them. Defendants shut plaintiff down until the contractor and the architect got the brick problem worked out. Still no progress payment was made. Later there was a weather delay. On March 23 defendants sent plaintiff a letter demanding it resume work within five days. "D" Building was completed. By then some 94,000 bricks had been laid. On May 3 a statement for $10,810 was sent to defendants. Neither a punch list nor progress payment was forthcoming. According to Herman Williams—half owner of plaintiff and overseer of the Southern Heights job—it was around the 9th of May when he talked to the head of Head, Mr. Head, about a progress payment, saying, "We got to a point where I, you know, jumped them about some money and that's when this here came up. They said, 'We can't give you no money because your work's unsatisfactory,' so I dropped it there and that's when this all started." Williams reviewed the work and corrected what he could find wrong, then checked with the architect who told him, "everything looked good then."

On the 11th of May, Williams pulled his men off the job after defendants again refused to make a progress payment. Said Williams, ". . . I went to the architect and I went, I don't know whether it was Head or Louis [O'Haver, Head's partner] now, but they said the work was satisfactory so I went down and asked them, 'Well, is the D Building all right?' and they said, 'Just fine,' and so I said, 'Well, I'd like to have some money,' and they said, 'No money' and so I said, 'I can't operate like this' so, I'd been there since February, and . . that was the reason I pulled off because I'd been there since February without a payroll and I had gone as far as I could go because I had five bricklayers there. . . . I didn't know what else to do and they were talking about starting another building and I said, 'I cannot start another building until I get some money . . . .' "

Williams also said he never submitted a payroll report to Head because one was not requested until May 16, five days after he

---

1. Defendants did pay plaintiff $1,237.50 on May 9, 1973 for the firewall work performed the previous November. They maintained the pay delay was because it was not invoiced until March 22, 1973.

left the job. He complied by filing such a report on June 25. Williams testified that he had worked on other FHA projects and had not had to furnish payroll reports yet had received monthly progress payments.

Head's Mr. Head had moved to Costa Rica and did not appear at the trial. Head's co-head, Louis O'Haver, did appear and was called to the stand by plaintiff. He said he had paid plaintiff nothing by May 11 because "I couldn't." The contractor, he said, usually received progress payments from the owner "anywhere from 45 to 60 days after we submitted our estimates."

However, about two weeks after plaintiff terminated the subcontract, leaving it up to defendants to complete the brickwork themselves, defendants managed to obtain a $12,810 progress payment. On May 22 plaintiff filed a mechanic's lien against the apartment property for $10,810. Defendants discharged the lien June 24, 1973 by depositing $10,810 and posting a costs bond with the county clerk. Thus the status remained until this action was filed May 16, 1974, seeking judgment for $10,810, attorney's fees, and foreclosure of the lien based on the allegation that plaintiff performed the subcontract according to its terms and conditions.

In their amended answer defendants admit plaintiff performed under the subcontract until May 11 and then say it breached the contract by walking off the job. The breach, continue defendants, caused them to have to spend $24,058.91 over and above the agreed contract price and they prayed for judgment in that amount.

II

The trial judge sustained a demurrer to plaintiff's evidence after concluding that it had "failed to sustain the allegations of its Petition." He then proceeded to grant defendants judgment on their "counterclaim" by granting an "excess cost judgment" in the amount of $22,478.67 ($50,943.12 total costs less contract price of $28,464.45) and against it set off the $10,810, leaving balance due on the judgment of $11,668.67,

along with an award of $2,248 for defendants' attorney's fees.

III

Plaintiff begins its argument by asking this question: "Did the plaintiff have the right to terminate or rescind the contract for failure of defendant to withhold [make] progress payments [to it] . . .?" The answer is, of course, according to plaintiff, that he did because defendants' failure to make prompt progress payments constitute a material breach of contract. The masonry company relies on the provisions of 15 O.S.1971 § 233—allowing a party to rescind where, through fault of other party to contract, the consideration fails in whole or in part—and two decisions applying them, namely, *Wallace v. Smith*, 205 Okl. 557, 240 P.2d 799 (1951); *G. A. Nichols, Inc. v. Hainey*, 190 Okl. 242, 122 P.2d 809, 139 A.L.R. 967 (1942), in these words: "A partial failure of performance is ground for the rescission of a contract, when such failure defeats the object of the contract, or when it concerns a matter of such importance that the contract would not have been made if default in that particular had been . . . contemplated."

Defendants do not really come to grips with the basic issue. They refer to a series of statutes relating to elementary rules of contract creation, existence, and interpretation—without disclosing their relevance to the question posed—and to a decision, *Berland's Inc. v. Northside Village Shopping Center, Inc.*, Okl., 506 P.2d 908 (1972), which applies the general rule that a condition precedent to rescission is that the rescinder restore the other party to his precontractual status quo. And so without addressing at all the subject of why Head made no progress payments to plaintiff on or before May 11—either with evidence or other explanation—defendants are content with offering this conclusionary argument as a complete answer to plaintiff: "[P]laintiffs herein did breach the contract and walk off of the project and did file a lien against the project, all in violation of the contractual provisions prior to the date that defendant

herein received progress payments on this project."

## IV

As we see it the controlling question is whether Head breached its agreement to make progress payments and if so was this a material contractual violation justifying termination of the contract and excusing plaintiff's further performance of it?

■ Prefatorily, we should mention that there is a distinction between rescission and termination of a contract[2] and we will use the latter term because it more appropriately describes the legal effect of plaintiff's conduct and pleadings in this case—it affirmed the executed portion and sued for the subcontract price of the work done, instead of renouncing the pact altogether and suing for the value of the work it completed on a quantum meruit basis.[3]

■ Failure of defendants to pay a progress installment due under the contract is a substantial breach by the general contractor and gives the subcontractor the right to terminate the agreement, stop work, and recover the value of the work already done. *Phillips & Colby Constr. Co. v. Seymour*, 91 U.S. 646, 23 L.Ed. 341 (1876); *American-Hawaiian Eng'r & Constr. Co. v. Butler*, 165 Cal. 497, 133 P. 280 (1913); *Scheible v. Klein*, 89 Mich. 376, 50 N.W. 857 (1891); *Jones v. City of New York*, 47 App.Div. 39, 62 N.Y.S. 284 (1900); *Zemp Constr. Co. v. Harmon Bros. Constr. Co.*, 225 S.C. 361, 82 S.E.2d 531 (1954). Of course, the stated rule contemplates that the subcontractor has substantially fulfilled mutual and dependent obligations required of him, unless the general contractor has waived their performance expressly or by implication.

■ In view of this law, it seems to us the question becomes one of determining whether plaintiff's evidence was sufficient to justify a finding that it became entitled to a progress payment at least by May 1, by which time it had corrected all complained of work and had almost completed Building "D" all to the satisfaction of the architect? We think it was. The subcontract required the contractor to make installment payments for the work done or as it progressed and referred to the provisions of the prime contract for the frequency of the installments. The latter contract provided for monthly payments to be made upon five days' notice. It is true, of course, that the subcontract provided that the progress payments to the subcontractor were to be payable upon their receipt by the contractor, but this provision was intended as a protection to the contractor and not as a device for avoiding progress payments.

The evidence is that for the bricklaying work performed plaintiff received no money from February to May 11, when it quit the job. This was a long time for plaintiff to have to finance such a job. The testimony of plaintiff's foreman was that on other FHA projects similar to the one in question he would receive monthly progress payments. It is true that a few days after plaintiff terminated the contract defendant Head wrote it, requesting for the first time a weekly payroll report together with a final payroll report. This, however, appears to be somewhat of an afterthought, the importance of which diminishes in view of the fact that defendants never complained of not having a payroll report before, particularly while they were urging plaintiff to continue with the brickwork, and the fact that the only reason given in March or April for not paying plaintiff was because some of its work was "unsatisfac-

---

**2.** "Termination" of a partially performed executory contract is to end it as to the unperformed remainder. "Rescission," on the other hand, is broader in scope and contemplates an annulment so that the contract is voided ab initio accompanied by restoration of the parties to the precontract status. *F. & M. Drilling Co. v. M. & T. Oil Co.*, 192 Okl. 372, 137 P.2d 575 (1943).

**3.** Such value was established to be at least $165 per thousand bricks laid, and a maximum of $261 per thousand (the amount defendants say they spent), as compared to the contract price of $115 per thousand.

tory." Once the work product was corrected to the satisfaction of the architect, a substantial progress payment should have been forthcoming within at least five days. But, it was not. Plaintiff waited until May 11; and when it received neither money nor explanation as to why not, it quit. We hold under the evidence plaintiff proved it substantially performed its agreement and therefore had a right to quit for the lack of an installment progress payment. Thus it was error for the court to sustain a demurrer to plaintiff's evidence.

### V

■ We should mention another matter touched on by defendants and that is that in filing a mechanic's lien plaintiff violated another term of the subcontract—namely, to keep the project premises free of liens. In our opinion plaintiff did not transgress the anti-lien proviso. The contractual requirement is aimed at compelling a subcontractor to pay for the labor and materials it uses on the job so as to prevent the filing of liens "arising out of and in the course of [its] performance of [the] sub-contract." The clause certainly does not purport to extinguish the subcontractor's statutory right of protection against nonpayment of the contract price.

### VI

■ Defendants presented no evidence significantly contradicting that adduced by plaintiff. More particularly, they offered no evidence that plaintiff's ultimate work product was anything but satisfactory. They offered none as to why progress payments were not made prior to May 11, except to say Head did not receive progress payments for the brickwork until around "45 to 60 days after we submitted our esti-mates"—a situation which, if true, was a breach of the prime contract, and one which was never explained to plaintiff before trial. The record indicates defendants did receive progress payments for the materials they furnished. Failure to timely request of owner payment for plaintiff's work is in itself a breach of an implied obligation it owed plaintiff. Moreover, it was quite a coincidence that found Head receiving a substantial progress payment for brickwork shortly after plaintiff terminated the contract. And still no effort was made to pay plaintiff. In any event the only evidence offered by defendants was in regard to how much they spent completing the brickwork —namely, about $261 a thousand and therefore no evidentiary foundation exists for a judgment in their favor on their counterclaim.

### VII

The judgment below is therefore reversed and judgment is entered for plaintiff against defendants for $10,810, together with six percent interest from the 11th day of May 1973, together with costs and $3,500 attorney's fees for services rendered by plaintiff's attorney both in the trial court and in connection with this appeal as provided for in 12 O.S.1971 § 936.

BACON, P. J., and NEPTUNE, J., concur.