**E. V. COX CONSTRUCTION CO., a corporation, Appellant,**

**v.**

**BROOKLINE ASSOCIATES, a general partnership, and its individual partners, David C. Sprague, Moss Travis, R. Paul Sprague, Theodore R. Racossin, and LeRoy Rubin, Individuals, Appellees.**

**No. 51600.**

Court of Appeals of Oklahoma, Division No. 2.

Nov. 20, 1979.

Released for Publication by Order of Court of Appeals Dec. 20, 1979.

John B. Hayes, Looney, Nichols, Johnson & Hayes, Oklahoma City, for appellant.

Robert E. Manchester and James E. Britton, McClelland, Collins, Sheehan, Bailey & Bailey, Oklahoma City, for appellee.

BRIGHTMIRE, Judge.

A general contractor, engaged to build a five story office complex in Oklahoma City, filed this lawsuit against the project owners for the balance claimed to be due under the contract along with damages for the owners' breach. Plaintiff E. V. Cox Construction Co. was granted a judgment against defendants Brookline Associates, a partnership, and its partners. Cox, however, thought the amount awarded inadequate and perfected this appeal. Brookline—which had cross-petitioned for damages it said it sustained as a result of a breach of the contract by Cox—cross-appealed from a judgment denying it relief. Both parties raise multiple questions out of a complexity of facts, lengthy contractual terms, and cloudy law.

## I

On December 15, 1972 the parties entered into a written agreement—an AIA Standard Form Contract—calling for the construction of the Ehr-Lite Tower at a cost of $954,653. Work was to be completed within 210 days after its commencement. Final plans and specifications were in rough outline form only when the contract was signed and were not completed until January 1973. A change order was executed on May 29, 1973 increasing the contract price to $970,321, and Cox began work June 4, 1973 making its completion date December 1, 1973.

The building was not finished December 1, 1973. Nevertheless, Cox continued working and Brookline continued making progress payments. June 1974 arrived and the building still was not completed. Brookline's lender began to threaten foreclosure because the borrower would not repay $25,000 for interest the loan company had inadvertently failed to deduct when it made progress payments to Cox. It was also about this time that Brookline failed to make a progress payment that had come due and, when Cox complained, Brookline disclosed it had decided to abandon the project and terminate the contract.

The status of the situation at termination was this: Cox had received 13 progress payments totaling $810,530; there remained unpaid a fourteenth progress payment in the amount of $29,053.58, $8,578.80 on a Brookline check that had failed to clear, and retainage of $44,624.07; and the building was complete except for interior

finishing work subcontracted to the Ehr-Lite Company. Cox estimated the final completion work would run about $211,000 thus pushing the total building cost over the contract price by about $56,000. The contractor tried to talk Brookline out of abandoning the project pointing out that Ehr-Lite was bonded and its surety would have to finance the work if Ehr-Lite defaulted.[1] Brookline, however, would not relent. The loan company foreclosed its mortgage and Jim Cox (the president of Cox) purchased the unfinished building at the sheriff's sale.

Cox filed this action in February 1975 seeking recovery of the $44,624.07 retainage, $37,632.38 in unpaid progress payments, and $35,000 in lost profits. Brookline answered with a general denial and later a counterclaim for $50,850.26—the amount, it pleaded, of the damage it had sustained due to what it claimed was an "overpayment" to Cox—as a result of the contractor's breach of the contract in failing to complete the structure within the agreed 210 day period.

The case was tried to the court October 28, 1975 and March 23, 1976. Findings of fact and conclusions of law were not filed until August 26, 1977 and judgment not entered until October 6, 1977. The court ruled in favor of Cox but awarded it only $37,326.27, the amount of the unpaid progress estimates. Brookline's counterclaim was rejected.

## II

Cox contends first of all that it should have been given judgment for the retainage as well as for the profits it lost as a result of Brookline's premature termination of the contract. Its argument—though somewhat convoluted if not contradictory—is, essentially, that the trial judge's failure to award it the retainage arose from a misconstruction, or at least a misunderstanding, of the contract's General Conditions as manifested in numbered paragraph 12 of his Conclusions of Law.[2] It argues that the condition relied on by the court—Article 9.7.4[3]—allows a contractor to recover retainage after it has been *permitted* to "substantially complete" a project but where final completion is delayed through no fault of its own. It does not, Cox says, govern situations such as the instant case where the owner abandons a project before it has even reached the "substantial completion" stage, and, therefore, the lower court erred when, on the basis of its construction of Article 9.7.4, it made "substantial completion" a prerequisite to Cox's right to recover the full amount it had earned prior to Brookline's termination. Tossed in alternatively is a claim that the "General Conditions" were not part of the contract at all because they were not incorporated therein by reference, and although the court erroneously found otherwise, he "properly concluded that the parties 'never acted under the A.I.A. General Conditions'" so they therefore did not apply.

---

1. There was some evidence, however, that both Ehr-Lite and its bonding company were bankrupt.

2. This Conclusion reads:
   "The plaintiff is not entitled to retainage unless the building is substantially completed and the final completion thereof is materially delayed through no fault of the Contractor and the other conditions of the contract are satisfied. . . . Therefore, plaintiff did not sustain its burden to be entitled to the unpaid retainage of $44,624.07."

3. The text of the General Condition upon which Conclusion 12 is based reads as follows:
   "9.7.4 If after Substantial Completion of the Work final completion thereof is materially delayed through no fault of the Contractor, and the Architect so confirms, the Owner shall, upon certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if bonds have been furnished as required in Subparagraph 7.5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims."

Nonetheless, continues the argument, if the conditions are considered to be a part of the contract then one other than the one relied on by Brookline controls, namely, Article 14.1 dealing with termination of the contract by the contractor. This condition supports its legal theory, says Cox, and provides that in the event the owner fails to make the required progress payments, the contractor may terminate the contract and recover payment from the owner for work completed and lost profits. Cox cited *M & W Masonry Construction, Inc. v. Head,* Okl. Ct.App., 562 P.2d 957 (1976) as case authority in further support of its position. And, it adds, the fact that the cost of finishing exceeds the amount of retainage is not a hindrance because a bonding company is in the background.

So, concludes Cox, it is clear that it did all · it was contractually obligated to do and that the lack of final completion was attributable solely to Brookline's failure to furnish plans for the interior finishing and its ultimate abandonment of the project.

Brookline's response to this line of reasoning is that 9.7.4, not 14.1, is the applicable article because it was Cox's untimely performance which caused the project to collapse and which also made it unable to pay Cox's fourteenth progress estimate. The owner goes on to argue that incorporation of the AIA General Conditions into the contract was accomplished in the Standard Form contract Articles 1 and 8.[4] And, it continues, if indeed agreement Article 8.2

does create a contractual ambiguity by failing to include the General Conditions among the specific documents included in the contract, then testimony regarding the intention of the parties becomes an important predicate for a finding resolving that issue. Such testimony, Brookline says, surfaced during the trial and the issue was resolved against Cox.

But, as Brookline realizes, there is still another obstacle in the path of its reliance on the General Conditions and that is the trial court's further conclusion that the parties never acted in accordance with them and therefore waived any obligations they created. In an effort to escape the thrust of this Brookline offers what it sees as fatal inconsistencies between that conclusion and certain of the trial judge's other conclusions and findings which seemed to indicate that the parties did act under the General Conditions. And to somehow bolster this argument, as it were, Brookline points out yet another inconsistency, viz., between the trial court's Conclusion 6 on the one hand—that Cox breached the contract—and Conclusions 3 and 5 on the other—that the parties modified the performance time and waived other conditions.[5] One cannot, says Brookline, have both a modification or waiver of contractual terms after a breach, but only a "waiver of a breach."

### III

We think it would not profit us to pursue all the secondary and tertiary issues con-

---

4. *Article 1 reads:*
"The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, all Addenda issued prior to execution of this Agreement and all Modifications issued subsequent thereto. These form the Contract, and all are as fully a part of the Contract as if attached to this Agreement or repeated ·herein. An enumeration of the Contract Documents appears in Article 8."
Article 8 provides:
"8.1 Terms used in this Agreement which are defined in the Conditions of the Contract shall have the meanings designated in those Conditions.
8.2 The Contract Documents, which constitute the entire agreement between the Owner and the Contractor, are listed in Article 1

and, except for Modifications issued after execution of this Agreement, are enumerated as follows:" (the General Conditions were not thereinafter enumerated)

5. Conclusion number 3: "There was a waiver of the contractual terms of the contract by defendants (Brookline)"
Conclusion number 5: "There was a modification of the written contract as to time [of] performance"—evidently an executed implied oral agreement resulting from conduct underlying the waiver.
Conclusion number 6: "The contract was breached by E. V. Cox Construction Co. on January 1, 1974, and thereafter, upon failure of plaintiff to complete the construction of the building on December 31, 1974 pursuant to the terms of the contract."

ceivable in this complex and hard fought case. As is usual in building construction contract cases things frequently happen which create gray problem areas puzzling to both parties and the court. But no matter how difficult the questions are nor how uninspiring the factual situation is, a decision ultimately has to be made. And while meting out perfect justice is our goal, its elusiveness will doubtless result in only a proximate attainment.

To resolve the central issues we think it best to consider the defaults or other conduct of the parties in the chronological order of their commission and discuss the consequence of each.

First of all it is undisputed that Cox did not complete the structure within the agreed time. Work continued past the 210 day deadline as though no limit existed. No exculpatory excuse for the seven month overtime was shown nor did Cox ever submit any written request for an extension of the contract period as required by General Condition Article 8.3. Brookline, however, did not declare the contract at an end but instead continued to make monthly progress payments as though no breach had occurred, albeit about the middle of February 1974 it did start complaining about completion delays underlining its reproaches with threats to stop making progress payments "until sufficient progress ha[d] been made . . . ." And at the same time, to keep things in proper perspective, Brookline itself apparently was never ready for the final completion of the building because it had not fulfilled its obligation to furnish Cox with the interior finish plans—an inference prompted by the fact that such plans were not yet in existence in June 1974 when Brookline cancelled the agreement.

Brookline, therefore, implicitly waived the breached time limit when it continued to make progress payments and otherwise assent to the delay. And once the specified time limit became inoperative the contractor became subject to a statutorily implied duty to perform within a reasonable time. 15 O.S.1971 § 173.

■ While Brookline, as we mentioned earlier, grumbled two or three times during the spring of 1974 about delays and on a couple of occasions temporarily held up on progress payments, the evidence does not demonstrate that the delay is what precipitated defendant's election to abandon the project. Apparently that decision arose from the pressure exerted by the lending institution on Brookline—through threat of foreclosure—to repay the $25,000 it had paid out inadvertently to Cox. The fact that one of Brookline's checks to Cox had bounced when coupled with its unwillingness to repay the $25,000 suggests that the partners comprising it decided not to put any more money into the project which, of course, they would have had to do since the construction loan fund was evidently depleted and the final completion costs were going to run about $211,000.[6] Absent was proof that the completion delay was unreasonable. Thus, Cox's delay did not excuse Brookline from continued performance and its termination of the contract constituted a breach entitling Cox to recovery for resulting detriment. 23 O.S.1971 § 21.

### IV

■ What recovery then, under the circumstances, is Cox entitled to? Certainly, as the trial court concluded, he is entitled to the progress payments earned before Brookline breached the contract. But was Cox entitled to the retainage and loss of

6. The final completion work was subcontracted to Ehr-Lite Corporation. This corporation, however, was bankrupt and, as it turned out, its bonding company was insolvent also.

According to Cox one of its earlier problems was with another subcontractor—Acme Glass Co.—whose slothfulness caused much of the delay. Cox officials said Brookline virtually forced them to accept the bids of both Acme and Ehr-Lite even though Cox had received lower bids.

This becomes more significant when coupled with the further fact that Brookline's project "overseer" was president of and had a financial interest in Ehr-Lite and Ehr-Lite was indebted to Acme for work the latter did on another project.

profits? We hold he is entitled to recover the former but not the latter. The retainage by definition was money earned by the contractor but withheld from the progress payments only to be paid "within 30 days after completion and acceptance by the architect, owner and lender." Brookline's cancellation of the contract and the foreclosure proceedings made the acceptance provision inoperative and ceased to furnish Brookline an excuse for further retention of the funds. Since the retainage money was already earned by and belonged to Cox, Brookline's failure to pay it to Cox was, one might say, detriment flowing indirectly from the breach for which recovery should have been allowed.

■ Cox's claim for loss of profits is another matter, however. Proof is lacking that Cox would have made any profit on the final completion work had the contract not been breached. On the contrary, the evidence suggests that a substantial loss loomed because the cost of the final completion exceeded the subcontractor's contract by about $56,000 and, since there is evidence that both the subcontractor and its bonding company were insolvent, it looks to us like Cox would have been exposed to a substantial loss. Our conclusion is that under the circumstances Cox failed to show it suffered any detriment from the breach in the form of a loss of profit.

V

The next question is whether or not the trial judge correctly rejected Brookline's counterclaim? We hold he did. Brookline's claim was for an alleged "overpayment of $50,850.26." It arrived at this figure by subtracting the cost of final completion ($211,640) from the contract price ($971,321) and then subtracting that difference ($759,-681) from the amount it had paid Cox ($810,531.36). The theory evidently rested on the assumption that the cost overrun

accrued in connection with the prefinal completion work performed prior to termination.

The theory is defective. None of the $810,531.36 could have been an overpayment because it was paid periodically for work performed and materials used or on hand. The potential overrun has to be attributed to the still to be performed interior finishing—the final completion—because that work alone is estimated to be $211,000 while subcontractor Ehr-Lite agreed to do it for $155,000. The disparity evidently resulted either from Ehr-Lite's bid being too low or from the estimated cost of final completion being too high. If the subcontractor's bid was $56,000 too low, then of course the prime contract price would likewise be too low by the same amount.

It seems clear, therefore, that Brookline's counterclaim has no merit.

VI

We come finally to Cox's last contention —that, as the prevailing party, it should have been awarded its attorney's fees for the prosecution of this action to recover for labor and services. Such an award, it argues, is statutorily authorized—indeed required—by 12 O.S.1971 § 936 [7] as construed in *Metropolitan Electrical Co., Inc. v. Mel-Jac Construction Co.*, Okl.Ct.App., 576 P.2d 323 (1978) and *M & W Masonry Construction, Inc. v. Head, supra.* Brookline, on the other hand, relies on *Russell v. Flanagan*, Okl., 544 P.2d 510 (1975) for its contention that this suit merely involves an action to recover on a contract for the erection of a building and is not an action to recover for labor or services such as would allow § 936 recovery of attorney's fees.

Brookline misconstrues *Russell.* The action in that case was not brought to recover "for labor or services" but rather for dam-

---

7. Section 936 reads:

"In any civil action to recover on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, unless otherwise provided by law or the contract which is the subject to the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs."

ages alleged to have arisen from the breach of an implied warranty in a contract for some sewer line service. The court held that though defendant prevailed in the lawsuit it could not recover its attorney's fees under § 936 because, as it read the statute, the action must be to recover for labor or services and not for other detriment that may result from breach of a contract even though the contract is one "relating" to the furnishing of labor or services. We are sure *Russell* did not mean to suggest that an award of § 936 attorney's fees to the prevailing party is precluded in cases where recovery is sought for labor or services performed pursuant to a contract relating to such labor or services. For to so hold would exclude from § 936 coverage all actions for labor or services except perhaps those founded on assumpsit or quantum meruit.

The action here was brought by Cox to recover the balance said to be due it for labor and services rendered on the Ehr-Lite Tower. It was based on a written contract which required that Cox "perform all the Work required by the Contract Documents for Ehr-Lite Tower," and that "for the performance of the work" Brookline "shall pay the Contractor . . . $954,653.00."[8]

### VII

The judgment below is therefore modified by increasing the judgment granted Cox to $81,950.34—the amount of the unpaid progress payments plus the retainage—and awarding it attorney's fees in the amount of $12,000 for the services of its attorneys rendered in both the trial court and on appeal.

Affirmed as modified.

BACON, P. J., and NEPTUNE, J., concur.

8. Articles 2 and 5 of the AIA Standard Form Agreement executed by Cox and Brookline. The total figure was later increased pursuant to an agreed modification.