PANAMA TIMBER COMPANY, INC., Appellee,

v.

Ronald BARSANTI, Appellant.

Nos. 52495, 52683.

Court of Appeals of Oklahoma, Division No. 2.

April 8, 1980.

Released for Publication by Order of Court of Appeals May 1, 1981.

---

Larry B. Lucas, Poteau, for appellee.

Tom E. Smith, Poteau, for appellant.

BRIGHTMIRE, Presiding Judge.

Under attack in this dual appeal are (1) an order of June 6, 1978 denying defendant Barsanti's motion to vacate both the ex parte appointment of a receiver of his LeFlore County Creosote Plant and the restraint of Barsanti from interfering with the receiver's possession of the business, and (2) an order entered July 18, 1978 overruling Barsanti's demurrer to plaintiff Panama Timber Company Inc.'s petition.

## I

■ The second appeal we can dispose of rather quickly. The order overruling defendant's demurrer to plaintiff's petition is an uncertified interlocutory order and not an appealable one. 12 O.S.1971 § 952; Civil Appellate Procedure Rules 1.10(a), 1.40 and 1.50, 12 O.S.1971, Ch. 15, App. 2. Defendant's appeal No. 52,683 is therefore dismissed.

## II

The other appeal, No. 52,495, is from an order denying Barsanti's motion to vacate the receiver's appointment. It was filed within 30 days of the June 6, 1978 decision, and though the denial also is an interlocutory ruling, an appeal from it is specifically authorized by 12 O.S.1971 § 993.[1]

Barsanti's challenge of this order is bottomed on the theory that plaintiff failed to allege or prove sufficient facts to authorize the appointment. We agree and reverse.

## III

The operative facts are in some respects unusual. Barsanti, a resident of Birmingham, Alabama, was president of Rab Valley Lumber, Rab Valley Wood Preserving, Division, Inc., an Oklahoma corporation. It was through this corporation he operated the subject creosote business. Barsanti was a registered forester, the holder of a degree in forestry from the University of Florida, a wood products consultant in this and other countries, and a man with over 20 years experience in the wood preservative business.

On September 15, 1975 he signed an instrument entitled "Contract for Sale, Assignment of Lease and Escrow Agreement." It recites that it was an agreement between Panama Timber Company, Inc., an Oklahoma corporation, as "seller" and Ronald A. Barsanti, as "buyer." However, it was not executed by Panama Timber but by one F.B. Garrett.[2]

Accompanying this instrument was a "Bill of Sale" also executed by F.B. Garrett which purports to transfer to Barsanti certain equipment, inventory, and fixtures specified in the first document for $166,000. Although it recites that Garrett was "acting as the authorized agent" of Panama Timber the bill of sale, curiously enough, also says that Garrett did "hereby covenant . . . that I am the lawful owner of the said goods and chattels." This instrument, like the others, bears no corporate seal and its acknowledgment identifies F.B. Garrett "as the grantor in the foregoing instrument" —a claim of ownership inconsistent with that represented in the first instrument.[3]

---

1. Amended in 1978.

2. The instrument bore no corporate seal or corporate acknowledgement as required by 16 O.S.1971 §§ 26, 93, 94 and 95 but did have an acknowledgement identifying F.B. Garrett as Executive Vice-President of Panama Timber.

3. Moreover, insofar as the "authorized" agency is concerned, there is no evidence Garrett had a power of attorney in fact as required by 16

The third document executed that day is entitled "Assignment of Leased Real Estate." In it Garrett is said to be the lessee named in a lease [4] he had earlier assigned to Panama Timber which in turn purports, by this third document, to reassign it to Barsanti. However, the reassigning instrument is not executed by Panama Timber but by F.B. Garrett and Herbert Williams.[5]

The first instrument called for a cash downpayment of $35,000 and the balance of $131,000 to be paid in eight semi-annual installments of $16,375 plus eight percent per annum interest on the unpaid balance. Among other things the agreement called for designation of Central National Bank of Poteau, Oklahoma as an escrow agent to "hold this agreement" until performed and "deliver [it] . . . to seller" if the buyer "shall default in any installment for a period of sixty (60) days after date any installment is due and all monies received are to be declared rent and damages and this agreement . . . shall automatically terminate."

Barsanti took possession of the property in October 1975 but was unable to start operations for two months because the "bore and mill" he bargained for was not yet completed. Finally the mill was finished and the plant began to fill orders. Things went along fairly well for a while and the first four semi-annual payments were made. Then coal miners across the country struck. The effect of the strike was soon felt by Barsanti in the form of a precipitous drop in demand for creosote products by railroads and coal mining companies (his main market). This forced temporary suspension of operations, and for this reason Barsanti was unable to make the fifth payment when due and his request for a reasonable extension was surprisingly refused. By this time Barsanti had paid $100,500 leaving a balance of only $65,500

on the purchase price of the plant and in addition he had paid to, or for the benefit of, Garrett another $141,000 as interest on old debts of Garrett and for inventory retained by Garrett. Eventually the strike ended and production was resumed. Almost immediately, however, Panama Timber applied for and got the receiver in question appointed.

Garrett caused this lawsuit to be filed on April 24, 1978—just eight days after expiration of the 60 day grace period—and on the same day, without notice to Barsanti, presented an order for the trial judge's signature appointing one Jack Stanley receiver of the creosote operation, directing him to take possession of the property immediately, setting no bond amount, and restraining Barsanti from interfering with the receiver's possession "during this cause of action" and from disposing of any of "such properties during the pendence of this action."

Stanley then signed an oath of office and a "bond" which bound him "unto Panama Timber Co., Inc.," in the sum of blank dollars "to be set" later, without a surety. The trial court "approved" this "bond."

In the meantime notice of the action was mailed to Barsanti in Alabama. He entered his appearance May 3, 1978 and filed a motion to vacate the order appointing the receiver and restraining him on the ground if was issued illegally.

The motion was heard June 6, 1978. Counsel for Barsanti argued the law and made an opening fact statement which he concluded by telling the court he was prepared to present evidence that no basis existed for the receivership. Counsel for Panama Timber then presented his argument in support of the receivership but offered no evidence.

O.S.1971 § 91 or, if he did, that it was executed and recorded in accordance with 16 O.S.1971 § 20.

4. The instrument refers to a recorded book and page number but a copy of the lease itself is not attached.

5. Although ultimately Panama Timber and Garrett may be estopped from asserting the invalidity of the assignment, this fact does not alter plaintiff's obligation to establish an appropriate factual foundation for a receivership.

"All right," said the court as soon as the lawyers stopped talking. "I am going to leave the receivership in effect, Mr. Lucas. Do you have a suggestion as to what the bond ought to be?"

Notwithstanding the hasty ruling Barsanti's lawyer asked for permission to put his client on the stand with the intent of laying a predicate for appellate relief and perhaps to arouse the judge's interest in the facts and persuade him no ground existed for the receivership. The request was granted but, alas, when the testimony ended the court without comment or further ado set the receiver's bond at $50,000 and adjourned court.

### IV

In defense of the trial court's action Panama Timber argues the pleaded facts bring it within the statutory criteria governing the court's power to appoint a receiver.[6] The one "most applicable to the facts in this case", says Panama Timber, is the one permitting the appointment of a receiver in an action "by a creditor to subject any property or fund to his claim . . . on the application of the plaintiff, or of any party whose right to or interest in the property or fund . . . is probable, *and* where it is shown that the property or fund is in danger of being lost, removed, or materially injured." (emphasis added)

The second relevant criterion, says plaintiff, is one specifying that a mortgagee may have a receiver appointed if he can show the security is "in danger of being lost, removed or materially injured . . . *and* that the property is probably insufficient to discharge the mortgage debt." (emphasis added)

And the third applicable statutory basis, according to Panama Timber, is the last one which provides that the court may appoint a receiver in "all other cases where receivers have heretofore been appointed by the usages of the courts of equity."

As supplementary argument, Panama Timber contends that the reviewing court will not reverse an order appointing a receiver unless convinced its entrance was an abuse of discretion—a finding, it maintains, not possible here. The reasoning is that the trial court cannot be found to have abused his discretion unless there has been a failure to prove one or more of three elements, namely, "(a) a strong probability that it [plaintiff] would prevail on the merits in the main action; (b) that it [plaintiff] would suffer irreparable loss and injury if the appointment was not made; and (c) that it [plaintiff] had no other plain, speedy, or adequate remedy." For these elements Panama Timber relies on *Eason Oil Co. v. Oklahoma City Petroleum Corporation*, 185 Okl. 448, 94 P.2d 222 (1939). And, concludes plaintiff, it proved all three elements.

### V

▮ In resolving the decisive issue in this case there are some other legal precepts that must be considered. The power to appoint a receiver is a delicate one and should be exercised with extreme caution.[7] Such relief is always provisional and ancillary to pursuit of proper substantive relief.[8] It is not possible in this state to invoke the jurisdiction of the court with a pleading that merely seeks the appointment of a receiver and other ancillary relief.[9] Moreover, insolvency of a mortgagor alone is not a ground for appointment of a receiver—insolvency must be coupled with evidence that the security is insufficient to satisfy the debt.[10] And ultimately, before the court appoints a receiver he must be able to determine from the information before him that (1) plaintiff appears to have a valid interest in the property involved, and (2)

---

**6.** 12 O.S.1971 § 1551.

**7.** *Healey v. Steele*, 158 Okl. 194, 13 P.2d 140 (1932).

**8.** *Oklahoma Company v. O'Neil*, Okl., 440 P.2d 978 (1968).

**9.** Id.

**10.** *Zenith Limestone Co. v. Exchange Trust Co.*, 169 Okl. 215, 36 P.2d 725 (1934).

the property is being used in such a way as to probably result in irreparable loss to plaintiff, should he prevail in his lawsuit.[11]

## VI

To properly apply the law to the facts it is essential to first analytically examine the petition. It was filed by Panama Timber through F.B. Garrett, identified as an "Acting Vice-President,"[12] and he verified the truth of its allegations. They were that Panama Timber and Barsanti entered into the written instruments mentioned earlier which were made a part of the petition by attached copies; that Barsanti breached the payment terms; and therefore plaintiff was entitled to rescission[13] of the contract and its "foreclosure ... without sale." That was called plaintiff's "First Cause of Action." For what it entitled its "Second Cause of Action" plaintiff alleged that "the property in this case is in the illest of repair, virtually abandoned, and stands a good chance of being lost and a receiver should be appointed forthwith to take charge of all such property and secure its well being for the benefit of plaintiff." And for its "Third Cause of Action" it stated that all the property in question was "personal property" and it "possibly might be disposed of during these proceedings and that a restraining order should issue to defendant, ordering him to refrain from disposing of any of such property, or interference with the possession thereof by the receiver." It was further alleged that some of the personalty was inventory "owned by

this defendant, personally," was not claimed by plaintiff and should not be covered by the restraining order.

Plaintiff prayed for judgment against Barsanti, "for rescision [sic][14] of 'Exhibit 1' [all the written instruments—the contract, the bill of sale and the lease assignment] and possession of all items of property described therein. For further judgment against the defendant pursuant to such contract that all monies previously paid, be adjudged to be liquidated damages and rent."

Next it asked for appointment of a receiver and a restraining order.

And then finally it asked for a "judgment forever barring defendant ... from claiming any liens, estates, or interests or title in and to such property. It is noted," added Panama Timber, "that plaintiff does not seek any money damages against defendant, and, therefore, that no sale be had upon such property."

To recapitulate, Panama Timber presented to the court a petition signed and verified by Garrett in which it alleged that it had a contract with defendant; that defendant breached the payment clause entitling it to both rescind the contract and foreclose it without sale; that because the property involved was in "illest of repair, virtually abandoned and stands a good chance of being lost" a receiver should be appointed, and that because defendant might dispose of some of the property plaintiff thought it was entitled to further ancil-

---

11. *Ward v. Inter-Ocean Oil & Gas Co.*, 52 Okl. 490, 153 P. 115 (1915).

12. If this was intended as a representation of Garrett's relationship to Panama Timber then it appears the contract was not executed by the president of the corporation nor by its vice-president as required by 16 O.S.1971 § 93 but by someone "acting" as a vice-president.

13. The typewritten word "recision" [sic] has been lined out with black ink and above it has been written the word "termination L.B.L." Just when this alteration was made is not shown, but it had to be sometime after the hearing of defendant's motion to vacate the receivership on June 6, 1978 because Panama Timber's counsel at that time told the court during his opening statement, "[W]e are com-

ing under contract law to rescind the contract and to foreclose it," and "We want it [the contract] rescinded under the contract law and we want it foreclosed.... It is a rescision [sic], foreclosure lawsuit proceeding," and still later, "We are foreclosing the contract. Therefore, plaintiff is entitled to rescision [sic] of the contract and foreclosure of same ...."

Obviously the allegations in existence at the time the court acted on the receivership matter *must control us here.*

14. This word has also been crossed out and the term "termination L.B.L." written in above presumably at the same time as the alteration referred to in footnote 13.

lary relief in the form of a restraining order.

■ To begin with it is apparent that the contract in question could not be both "rescinded" and "foreclosed"—that is, repudiated and enforced—at one and the same time. And for rescission to be an attainable form of relief it is necessary for the plaintiff to allege one or more of the statutory grounds for it as well as to make a restorative tender.[15] Here the plaintiff merely alleged that defendant "breached paragraph II, subparagraph B, and the terms thereof, among other breaches." This allegation evidently refers to the "Contract for Sale" between Barsanti and Panama Timber (executed only by F.B. Garrett) which purports to sell and assign its interest in certain real and personal property described in the "Bill of Sale"—a document, it will be recalled, which recites that F.B. Garrett is the owner of the property and its acknowledged "grantor." The pleading does not disclose that the breach involved a consideration failure of a material nature—one possible ground for rescission [16]—as Panama Timber argues in its brief.

■ It is impossible from reading the petition to determine the exact nature of the complained of breach because paragraph II, subparagraph B reads in pertinent part:

"Buyer [Barsanti] does hereby agree to pay the total sum of $166,000.00 and is payable as follows, to-wit:

. . . .

B. The balance of $131,000.00 by making eight (8) semi-annual payments of $16,375.00 plus 8% interest per annum to be computed semi-annually on the unpaid balance, beginning February 15, 1976, and a like payment ever six (6) months thereafter until paid in full."

So, not only does the petition fail to allege a statutory ground for rescission but it alleges no *facts* upon which the court could anchor a conclusion that such a ground exists.

■ On the other hand even if the court ignored the rescission aspect of the pleading and considered only plaintiff's request to foreclose the contract without sale, similar difficulties still arise. Presumably the term "foreclose" is used in the sense of terminating the rights of the defendant in the property covered by the contract. The first and foremost difficulty is the fact that since the contract is for the sale of real as well as personal property and grants defendant an immediate right of possession along with deferment of title transfer (it is escrowed) until certain purchase money payments are made, it is by law deemed to be a constructive mortgage. The relevant statute [17] specifies: "No foreclosure shall be initiated nor shall the court allow such proceedings, unless the documents have been filed of record in the county clerk's office, and mortgage tax paid thereon, in the amount required for regular mortgage transactions." Not only does the petition fail to show compliance with these requirements, but the petition discloses on its face that such compliance is not possible because none of the documents were executed or acknowledged in the manner required by law as legal prerequisites for record filing.[18]

The third item of relief requested by Panama Timber was for possession of all items of property described in the written instruments, that "all monies paid be adjudged to be liquidated damages and rent," and that the court quiet title to the property in it. Whether such relief is merely ancillary to the primary relief requested we need not decide because the ambivalence and ambiguity of plaintiff's pleading—as we noted

---

15. *M & W Masonry Const., Inc. v. Head*, Okl. App., 562 P.2d 957 (1977). "Rescission" of a contract is broader in scope than "termination" of a partially performed executory contract and contemplates an annulment voiding the contract ab initio, accompanied by restoration of the parties to their pre-contract status. See also 15 O.S.1971 §§ 232–235.

16. *Creach v. Home Owners' Loan Corporation*, 191 Okl. 484, 131 P.2d 108 (1942).

17. 16 O.S.1976 Supp. § 11A.

18. 16 O.S.1971 §§ 26, 91, 93, 94 and 95.

earlier—suggest two deficiencies, namely, (1) that Panama Timber is not a real party in interest and (2) the absence of F.B. Garrett as a named plaintiff. Both are facially apparent fatal defects of parties plaintiff.[19] The latter conclusion is based on the apparent fact that Panama Timber sold property owned by Garrett, which, if true, means that Garrett is the real party in interest and the only one who can complain of any breach of the contract. In any event the allegations fail to disclose that Panama Timber's "right to or interest in the property or fund is probable" or that it would probably prevail on the merits should the action go to trial.

Lastly, plaintiff has not alleged facts indicating that the property is being used in such a way as to probably result in irreparable loss to it or anyone else for that matter. Or, to use the words of the statute, there is no allegation that the security is "in danger of being lost, removed or materially injured," or "that the property is probably insufficient to discharge the mortgage debt." The phrase "in danger of being lost" has been construed to require factual allegations and proof of circumstances leading to the belief there is imminent danger of the involved property being lost.[20] Plaintiff's allegation—that the property "stands a good chance" of being lost—is not only an inoperative conclusion but does not connote that the danger of loss is "imminent."

### VII

It is clear that the content of the petition is not sufficient to justify Stanley's appointment. But what about the evidence? Does the record disclose that evidence was presented to the judge sufficient to support any of the statutory grounds for receivership either as a prelude to the appointment, or later on June 6, 1978, as a

belated effort to undergird the receivership with a valid foundation? It does not. True, counsel for plaintiff at that time did mention in his oral statement to the trial judge that some sworn testimony concerning the "ill state of repair" of the "place" was presented to the court—"I can remember two things," said the lawyer, "that were worth some money, you [the judge] said around $750.00 or something like that, laying [sic] in the mud, that had just been thrown aside and the whole place looked like that . . . ." But the judge did not acknowledge having heard any sworn testimony when he appointed the receiver, and certainly if all he had heard was something in the nature of what the lawyer suggested he had, it would have fallen even further short of the statutory mark than the conclusory allegations of the petition.

Of course, the lawyer may have recognized this fact because later in his oral statement he alludes to another "matter . . . that came to your [the judge's] attention on the appointing of the receiver . . . . I showed you a letter in our file and I handed it to you as I recall, from an insurance company that says to the plaintiff in this case, there is no longer insurance. . . . Lumberman's Underwriting Alliance Company a month before the lawsuit started simply [gave notice] . . . that it elects to cancel [the] policy . . . and . . . all liability under [the] policy will cease and terminate within ten days of receipt of this letter. Mr. Barsanti," continued the unsworn lawyer, "had knowledge of this. He was the insured. My clients were but the mortgagees in the policy." And the lawyer goes on to say that Barsanti never arranged for any other insurance policy thus providing another reason why a receiver was necessary—to purchase insurance covering the property.[21]

**19.** 12 O.S.1971 § 267.

**20.** *Healey v. Steele, supra* note 7.

**21.** Incidentally, there was no other insurance covering the property at the time of the hearing although the receiver had taken possession of

the property and had begun to operate the plant. Nor was there any attempt to explain why the receiver had not taken care of this "matter" the first thing in view of the asserted importance.

Barsanti's testimony tended to contradict this, however. He said he first received notice from Garrett about a possible cancellation of the policy and later on heard from the insurance company. Negotiations ensued and because the insurer had not refunded the unearned portion of the annual premium Barsanti had paid, he felt like the company's legal liability remained. Certainly it is of interest, and more than a little curious, why the cancellation notice was issued in the first place. The record is silent on the subject.

The other thing about this insurance matter, and a more important one incidentally, is that we cannot find in any of the documents mention of an obligation on the part of Barsanti to carry any insurance on anything. No doubt he would want to at least protect his own insurable interest, but he had no obligation to protect whatever insurable interest plaintiff or anyone else had in the property. It was up to plaintiff to protect itself in this respect.

 Still another fatal flaw in the procedure was that the trial judge appointed the receiver on April 24, 1978 without requiring the execution of a surety "undertaking" or bond as commanded by 12 O.S. 1971 § 1553. Compliance with this statutory requirement is a mandatory prerequisite to the valid appointment of a receiver.[22] The fact that a surety bond in the sum of $50,000 was executed following the June 6 hearing did not operate to breathe legal life into the April 24th appointment and, as we have seen, no new appointment was made on June 8.

 Finally, the undisputed evidence presented to the judge on June 8 was that the creosote plant had been appraised in February 1977 by a professional appraiser from Tulsa, Oklahoma who had issued a written report to Barsanti March 7, 1977 advising him as follows:

| | |
|---|---|
| "Real property value (Land & Building Improvements) | $ 125,000 |
| Equipment Value | 1,265,000 |
| Total Market Value Estimate | 1,390,000" |

It further appeared that Panama Timber and Garrett had been paid more than $241,000 and were owed a balance of only $65,500—less than five percent of the appraised market value of the property. This undisputed evidence would not have supported a finding that the property was probably insufficient to discharge the mortgage debt.

### VIII

For these reasons we hold that there existed no legal, just or reasonable basis for the order of April 24 appointing Jack Stanley receiver of the property in question, or authorizing him to seize and possess Barsanti's property, or restraining Barsanti from exercising his right of ownership in the property. In issuing the ex parte order the trial judge exceeded his judicial authority.

The order appointing the receiver entered April 24, 1978 being void is vacated and the cause remanded for further proceedings with regard to plaintiff's petition and defendant's cross-petition for damages he says he has sustained as a result of the wrongful receiver appointment.

BACON and NEPTUNE, JJ., concur.

---

22. *Sweins v. Superior Court in and for Monterey County, et al*, 16 Cal.App.2d 336, 60 P.2d 313 (1936).